# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL DYSON, | ) | |
| | ) | No. 13 CV 3248 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| TIMOTHY SZARZYNSKI and THE | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | December 18, 2014 |
| Defendants. | ) | |

## MEMORANDUM OPINION and ORDER

Plaintiff Michael Dyson brings this civil rights action against Defendant Sergeant Timothy Szarzynski under 42 U.S.C. § 1983, claiming that Szarzynski violated his constitutional rights by subjecting him to false arrest and malicious prosecution.  Dyson also asserts that Defendant City of Chicago has an obligation to indemnify Szarzynski if a judgment is entered for compensatory damages in favor of Dyson and against Szarzynski.[1]  According to Dyson, he was standing in the area of the 1100 block of West 88th Street in Chicago, Illinois, on August 9, 2012, when Szarzynski, who was responding to "reports of shots fired," approached him and recovered a handgun nearby. (R. 6, First Am. Compl. ¶¶ 5-7.)  Szarzynski then placed Dyson under arrest and charged him with possessing the weapon.  Dyson

---

[1] Defendants jointly filed their motions *in limine* but because the City's obligation to indemnify Szarzynski depends on whether Dyson prevails in his claims against Szarzynski, the City will not be a participating party at trial.  There is no dispute that the City has an obligation to indemnify and that Szarzynski was an employee of the City and acting within the scope of his employment at all times relevant to this action.  (R. 8, Ans. at 4-5.)  Accordingly, Defendants' motions *in limine* are treated as Szarzynski's motions *in limine*.

was ultimately acquitted of the possession charge. (Id. ¶¶ 10-12, 17.) The parties have consented to the jurisdiction of this court. (R. 19); *see* 28 U.S.C. § 636(c). Before the court are Dyson's motions *in limine* Nos. 1-8, Szarzynski's motions *in limine* Nos. 1-6, and agreed motions *in limine* Nos. 1-9. For the following reasons, Dyson's motion Nos. 1, 3, 4, and 6-8 are granted, Dyson's motion No. 2 is denied as moot, Dyson's motion No. 5 is granted in part and denied in part, Szarzynski's motion No. 1 is denied without prejudice, Szarzynski's motion Nos. 2-4, and 6 are granted, Szarzynski's motion No. 5 is granted in part and denied in part, and agreed motion Nos. 1-9 are granted:

## Legal Standard

Although not expressly authorized by the Federal Rules of Evidence, the authority to make rulings on motions *in limine* springs from the court's inherent authority to manage trials. *Luce v. U.S.*, 469 U.S. 38, 41 n.4. (1984); *Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002). Motions *in limine* are employed to "exclude evidence before trial in order to prevent the trial from being interrupted by wrangles over admissibility or the jury from getting a whiff of prejudicial evidence that may in fact be inadmissible." *American Int'l Adjustment Co. v. Galvin*, 86 F.3d 1455, 1463 (7th Cir. 1996). But because the primary aim of *in limine* motions is to exclude evidence that is inadmissible on any ground, some rulings are best deferred until trial so that the context, foundation, and relevance of the contested evidence can be better understood. *Anglin v. Sears, Roebuck & Co.*, 139 F. Supp. 2d 914, 917 (N.D. Ill. 2001). As such, neither a ruling granting a

motion *in limine,* nor a ruling denying one, needs to be the final word on the matter. The court is free to revisit the following rulings during trial. *Luce*, 469 U.S. at 41-42.

**Analysis**

**A.**      **Dyson's Motions *in Limine***

     **1.**      **Motion No. 1 to Bar Argument or Mention of Police Officers Risking Their Lives on the Job**

Dyson seeks to prevent Szarzynski from making "general argument or mention" of police officers risking their lives on the job. (R. 47.) He argues that the risks endured by police officers do not have any bearing on whether there was probable cause to arrest him, or whether he was prosecuted maliciously. In particular, Dyson expresses concern that such evidence will violate Federal Rule of Evidence 404(b) because it is "a masked method of implying that police officers are heroes." (Id. at 2.) Szarzynski responds that his beliefs about his own personal danger are relevant because those risks "influenced [his] judgment and responses [on] the day in question." (R. 65, Resp. at 1.)

The court agrees with Dyson that risks faced by police officers in general do not have any tendency to make any consequential facts in this particular action more or less likely. Neither a claim for false arrest nor malicious prosecution relates to police officers risking their lives on the job. To the contrary, "heroizing" the deeds of police officers might unfairly sway a jury into the consideration of matters outside the scope of fact finding. *See, e.g., Battle v. O'Shaughnessy*, No. 11

CV 1138, 2013 WL 3984463, at *6 (N.D. Ill. Aug. 2, 2013). Accordingly, Dyson's motion No. 1 is granted.

### 2. Motion No. 2 to Bar the Use of the City's Citizen Law Enforcement Analysis and Reporting Database

In his motion *in limine* No. 2, Dyson sought to bar Szarzynski from using the City's Citizen Law Enforcement Analysis and Reporting ("CLEAR") database to conduct background checks on potential jurors during and after jury selection to verify the honesty of their responses to *voir dire* questions regarding their arrest and conviction histories. (R. 48.) Dyson argued that Szarzynski's use of CLEAR to vet those responses would be "unfair and inappropriate" because he himself did not "have the access to publicly funded, but secretly maintained information databases such as CLEAR and LEADS." (Id. at 2.) In response, Szarzynski explained that his plan is to perform the background check using CLEAR *before* the jury selection and then to share the results of the check with Dyson and the court. (R. 62, Resp. at 2.) In light of Szarzynski's representation in his response to the motion, Dyson withdrew his motion opposing the use of CLEAR. (R. 76.)

Despite Dyson's change in stance, the court held a hearing on November 18, 2014, to receive more information about how and when the proposed background check is to be performed within the context of the court's jury selection protocol, and to note its own reservations about performing background checks of potential jurors. (R. 88.) During the hearing Dyson expressed general concerns about performing juror background checks and the possibility that Szarzynski may conduct selective checks to remove African American jurors. Despite his concerns, in light of

Szarzynski's representation that he would share all information gleaned from the CLEAR database and that a check would be conducted on all potential jurors, Dyson did not renew his opposition to the use of the CLEAR database. The court nonetheless comments briefly here to air its concerns regarding the propriety of this practice and to establish parameters regarding Szarzynski's proposed use of the CLEAR database during *voir dire*.

The propriety of allowing a litigant in a civil case to access police databases to perform background checks on potential jurors and to use such information during *voir dire* is an unsettled question in this district. In a number of fairly recent cases, civil rights plaintiffs have challenged the City's use of juror background checks during *voir dire*. *See, e.g., Logwood v. City of Chicago*, No. 11 CV 4932, 2013 WL 1385559 (N.D. Ill. Apr. 4, 2013); *Padilla v. City of Chicago*, No. 06 CV 5462, 2013 WL 6354169 (N.D. Ill. Dec. 3, 2013); *Hill v. City of Chicago*, No. 06 CV 6772, Minute Entry 562 (N.D. Ill. June 30, 2011); *Anderson v. City of Chicago*, No. 09 CV 2311, 2011 WL 2292327 (N.D. Ill. June 9, 2011); and *Davis v. Colon*, No. 08 CV 5130, Minute Entry 71 (N.D. Ill. June 6, 2011). In some of these cases, the City was allowed to conduct the background checks. *See Logwood*, 2013 WL 1385559 at *1 (allowing the checks because the plaintiff "cite[d] no controlling precedent [holding] that parties are barred from running background checks on potential jurors"); *Davis*, No. 08 CV 5130, Minute Entry 71 (allowing the background checks but requiring that the check "comport with the court's jury selection process, [and requiring that] all results . . . be shared"). In other instances, background checks

were not allowed, either based on concerns that using a law enforcement database in connection with a civil case may violate the administrative regulations restricting its use to "law enforcement purposes," *see Padilla*, 2013 WL 6354169, at *4-5, or based on logistical concerns that the background checks could result in jurors being removed after the trial had begun, *see Hill*, No. 06 CV 6772, Minute Entry 562. But none of these rulings fully flesh out the benefits and pitfalls of allowing officer defendants or the City to access police databases to verify potential jurors' *voir dire* answers.

One potential pitfall of juror background checks is that prospective jurors might come to the conclusion that all information that can be gathered ought to be gathered, regardless of the court's prohibition against independent juror research. This concern is expressed by Caren M. Morrison, *Can the Jury Trial Survive Google*, 25 WTR Crim. Just. 4, 15 (2011), who argues that judicial tolerance of increasingly invasive probes into jurors' backgrounds may cause jurors to "feel entitled to do a bit of research on their own just to balance the scales." Elaborating on Morrison's point, if jurors perceive that nothing is to be taken on trust, they may withhold their trust from the lawyers or even from the court by attempting to ascertain answers for themselves through independent investigations. In other words, it is possible for attorneys and courts to overplay their hands in the quest for an impartial jury.

Another potential pitfall is that a defendant's use of a police database to run juror background checks could create an unfair imbalance in information that would

allow the defendant to preserve its preemptory strikes by marshalling the database results to strike jurors for cause. That concern is not a trivial one given the Supreme Court's holding in another context that depriving a party of the ability to make a for-cause challenge to a member of the venire may be grounds for a new trial. *See McDonough Power Equip. Inc. v. Greenwood*, 464 U.S. 548, 555-56 (1984). Szarzynski's offer to share the results of its background checks with Dyson and with the court would likely solve the information-mismatch problem here. In fact, it was Szarzynski's offer to openly share the information that prompted Dyson to withdraw his motion.

The court remains concerned that despite the parties' seeming agreement on the anticipated use of the information gleaned from a juror background check, allowing the practice might confer a measure of judicial authority to the CLEAR database, in spite of the fact that the court lacks meaningful information about its history, architecture, or accuracy. In other words, by approving the shared use of CLEAR as part of *voir dire,* it may appear that the court condones a use of technology for a purpose not intended by its designers, and in so doing may be perceived to lend judicial endorsement to a tool that may or may not accurately uncover juror dishonesty. Neither side has attempted to explain why the CLEAR database should be considered an accurate and reliable source of a potential juror's identity and arrest record.

Notwithstanding Dyson's acquiescence to the use of the database as long as search results are shared, this court is sensitive to the fairness concerns articulated

by Dyson and by others similarly situated in cases like this. Certainly, the practice of performing juror background checks as proposed implicates a power imbalance for plaintiffs who do not have access to CLEAR and who must simply trust the party they are suing to conduct an honest, thorough, and accurate search. Additionally, the concerns expressed in *Hill* and *Padilla* about the authority for using "law enforcement only" databases to defend civil cases may be valid ones. Moreover, this court is troubled by the possibility that *voir dire* background checks generally might undermine or supplant the established practices of jury selection in this country. The process of jury selection relies on potential jurors to answer *voir dire* questions honestly. Using CLEAR or similar databases to verify some of their responses may send an unwanted message to potential jurors that the court does not trust them or that the potential jurors' oath that they are to answer all questions truthfully and the oath administered to the trial witnesses are meaningless. Plus, the use of criminal background checks might seem intrusive to potential jurors and might have a chilling effect on their willingness to participate in the jury process. Notably, the potential jurors are not reporting for duty voluntarily but by summons.

But the prospect of real-time juror background checks during *voir dire* is not without its benefits, and the threat of juror bias to the justice system is not a bogeyman. Indeed, high-profile criminal trial of former Governor of Illinois George Ryan exemplified the sort of legal misadventure decried by proponents of juror background checks. *See United States v. Warner*, 498 F.3d 666, 674 (7th Cir. 2007).

In *Warner*, after a six-month trial, a jury began to deliberate the fates of former Governor Ryan and a co-defendant on various criminal charges. *Id.* at 675. But the jury deliberations proved to be tumultuous, especially when—on the eighth day of deliberation—various media reports emerged that a juror had given untruthful answers on the court's initial juror questionnaire. *Id.* at 676. And, as time progressed, details emerged that *multiple* jurors supplied the court with incorrect information about prior brushes with the law. *Id.* at 677. Although the district court ultimately dismissed several jurors, replaced them with alternates, and forced the reconstituted jury panel to begin deliberations anew, dishonest juror answers jeopardized the entire trial and threatened to lay waste to vast time expenditures and fees incurred by the parties. *See id.* at 677. Some journal authors have argued that the *Ryan* trial debacle is evidence that closer scrutiny of jurors during *voir dire* is warranted. *See* Eileen E. Rosen & Catherine M. Barber, *Criminal Background Checks of Prospective Jurors*, 60-Jun Fed. Law. 54, 55–56 (2013) (suggesting that the problems of the *Ryan* trial could have been avoided with background checks during *voir dire*). Rosen and Barber also make judicial efficiency arguments in favor of juror background checks and conclude that these checks should be embraced by the courts because "as long as any courts deny parties the opportunity to conduct juror background checks, extensive post-verdict litigation will persist and verdicts will remain in limbo." *Id.* at 56. In slightly different contexts, other scholars have stressed that the privacy interests of jurors should not be overvalued in relation to the ultimate goal of impartial justice. *See* Karen Monson, *Privacy for*

*Prospective Jurors at What Price?*, 21 Rev. Litig. 285, 287-88 (2002) (advocating against the adoption of broad privacy protections for prospective jurors). And in addition to the potential advantages of juror background checks, the court recognizes that such checks during *voir dire* seem especially relevant in false arrest cases like Dyson's, where the potential bias against law enforcement officers stemming from prior contacts with the criminal justice system could result in prejudice against the officers when they are defendants in a civil matter.

The importance of a rigorous and candid voir dire process is dramatically underscored by the recent Supreme Court decision in *Warger v. Shauers*, 574 U.S. __, (2014), 2014 WL 6885952 (2014). In *Warger*, the Supreme Court considered a litigant's plea for a new trial after post-verdict evidence emerged that a juror had deliberately lied during *voir dire*. The Supreme Court interpreted Federal Rule of Evidence 606(b) strictly by rejecting the more lenient approach to *voir dire* dishonesty taken by the so-called "Iowa Rule" and by instead adhering to the "federal rule" prohibiting evidence of *voir dire* dishonesty from upsetting a verdict. *Id.* at *5-6. Because *Warger* confirms that the problem of a dishonest juror becomes unsolvable once the verdict is returned, the seriousness of empaneling a fair and unbiased jury through *voir dire* is intensified all the more.

Despite the court's reservations about the proposal to conduct criminal background checks of potential jurors, Dyson has withdrawn his opposition to the use of CLEAR and has not renewed it. (R. 76.) Under these circumstances, there is nothing before the court requiring a decision, and the court declines to make one

*sua sponte* because the proposed background check will not interfere with this court's jury selection protocol. Therefore, Szarzynski may perform the background checks of potential jurors provided that the checks are performed with an observer representing Dyson verifying that the checks are conducted on all of the potential jurors. Szarzynski must then share the entirety of the results with Dyson and the court without publishing the same to others.

### 3. Motion No. 3 to Bar Arguments Appealing to the Jury as Taxpayers

Dyson seeks to prevent Szarzynski from appealing to the jury as taxpayers. (R. 49.) The Seventh Circuit instructs that appealing to jurors' pecuniary interests is improper. *See, e.g., Moore ex rel. Estate of Grady v. Tuleja*, 546 F.3d 423, 429 (7th Cir. 2008); *United States v. Schimmel*, 943 F.2d 802, 806 (7th Cir. 1991). Szarzynski concedes as much in response. (R. 63.) Therefore, Dyson's motion No. 3 is granted.

### 4. Motion No. 4 to Bar Reference to Area of Arrest as "High Crime" Area

Dyson seeks to bar Szarzynski from referring to the area in which he was arrested as a "high crime" area. (R. 50.) The general crime rate of a particular area has little to do with probable cause to arrest an individual, but in some circumstances it may be considered relevant. The Seventh Circuit has recently explained that "[f]or the high-crime-area factor to carry weight in a probable cause determination, there should be a 'reasonable connection between the neighborhood's higher crime rate and the facts relied upon to support probable cause.'" *Huff v.*

*Reichert*, 744 F.3d 999, 1007-08 (7th Cir. 2014). In other words, Szarzynski needs to offer specific facts to connect Dyson's location in a high-crime area to the facts that supported probable cause to have arrested him.

Here, Szarzynski simply argues that because probable cause is evaluated by considering the "totality of the circumstances," the crime rate of the area where Dyson was arrested ought to be considered by the jury. (R. 66, Resp. at 2-3.) But he does not offer any specific facts to connect the dots between the area's crime rate and his probable cause determination. Without this nexus, Dyson risks being portrayed as a ne'er-do-well solely because of his presence in the area, and the danger of unfair prejudice to him is not trivial. For these reasons, Dyson's motion No. 4 is granted.

### 5. Motion No. 5 to Bar Evidence of His Criminal History and Parole Status

Dyson next seeks to prevent Szarzynski from introducing any evidence related to his prior arrests, felony convictions, and his status as a parolee on the day of his arrest. (R. 51.)

**(a) Prior Arrests**

According to Dyson, his prior arrests that did not lead to an admissible conviction should be barred from trial. (Id. at 2.) Ordinarily Dyson is correct that prior arrests not leading to convictions are viewed as inadmissible character evidence. *See Betts v. City of Chicago*, 784 F. Supp. 2d 1020, 1024 (N.D. Ill. 2001) (prior arrests inadmissible under Rules 402 and 404(b)). Under Rule 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character

of a person in order to show action in conformity therewith." However, Szarzynski argues in response that because he expects Dyson to testify about alleged emotional damages resulting in "depression, humiliation, and being subjected to horrible conditions of confinement at Cook County Jail," the evidence of Dyson's approximately 30 arrests and 21 convictions resulting in multiple-year prison terms is fair game to rebut his testimony about emotional trauma from the arrest in this case. (R. 64, Resp. at 1.)

Other decisions in this district are supportive of Szarzynski's position that prior arrests may be admitted to rebut testimony about the emotional trauma of an arrest. *Goodman v. Babicz*, No. 09 CV 5954, 2013 WL 146377, at *8 (N.D. Ill. Jan. 14, 2013) (finding the fact that a plaintiff had been arrested and jailed two dozen times "was probative of the extent of his emotional distress"); *Gribben v. City of Summit*, No. 08 CV 123, 2010 WL 2928094, at *3 (N.D. Ill. July 20, 2010) ("[i]f presented with evidence that [the plaintiff] had been arrested and incarcerated numerous times in the past, the jury could conclude that [the plaintiff] would not have been as emotionally traumatized by the arrest . . . as he claims to have been."). On the other hand, as Dyson points out, from the perspective of an arrestee, the level of emotional trauma might be very different between wrongful and rightful arrests. *See Barber v. City of Chicago*, 725 F.3d 702, 713 (7th Cir. 2013). That is because "a person may suffer emotional distress from being falsely arrested and held for mere hours while suffering no or minimal emotional distress (or emotional distress of a different kind) after being rightfully arrested[.]" *Id.* There is also an

argument to be made that prior arrests could actually *sensitize*, rather than desensitize a person to the trauma of being placed and held in custody. *Betts*, 784 F. Supp. 2d at 1025. However, Dyson does not advance any facts or argument that his prior arrests have sensitized him to being taken into custody.

Some courts have concluded that the admissibility of prior arrests was in part related to how similar those arrests were in comparison to the arrest in question. *See, e.g., Moore v. City of Chicago*, No. 02 CV 5130, 2008 WL 4549137, at *1 (N.D. Ill. Apr. 15, 2008); *Brandon v. Village of Maywood*, 179 F. Supp. 2d 847, 885-55 (N.D. Ill. 2001). In *Moore*, the district court found that "to be relevant, the arrests must be substantially similar and the court must conduct a prejudice analysis." *Moore*, 2008 WL 4549137, at *1. Likewise, in *Brandon*, the district court refused to allow evidence of prior arrests because "[t]here is no indication that [plaintiff's] previous arrests involved similar facts, so their probative value is quite low." *Brandon*, 179 F. Supp. 2d at 855. Dyson asks the court to follow the approach of *Moore* and *Brandon* because "it allows for a more thorough investigation into the probative value that such arrests and convictions might have." (R. 86, Pl.'s Reply at 2.)

Neither party has presented the court with a comprehensive list of Dyson's prior arrests, let alone facts that might allow the court to differentiate between these prior arrests. Absent this information, and with a disinclination to engage in mini-trials about the similarities and differences between Dyson's prior arrests, the court declines to engage in this analysis. To be sure, there are myriad ways that

Dyson could open the door to his prior arrests. However, the risk of unfair prejudice to Dyson is considerable if prior arrest evidence is admitted without the door being opened first. For these reasons, Dyson's motion No. 5 is granted with respect to prior arrests. Szarzynski is free to raise this issue again after Dyson's direct examination.

### (b) Prior Felony Convictions

Dyson seeks to bar Szarzynski from referencing "any of [his] prior felony convictions that are older than ten (10) years." (R. 51 at 3.) But Dyson does not specify what type of convictions he seeks to exclude and, as Szarzynski points out, the specific crime of conviction and its accompanying period of incarceration can be material to admissibility determinations. (R. 64, Resp. at 2-3.) Neither Dyson nor Szarzynski has provided the court with a full accounting of all of the convictions in question. However, the parties are in agreement that Dyson's felony conviction for smuggling contraband into a penal institution is inadmissible. In light of this agreement, Dyson's motion is granted as to the felony smuggling conviction. In addition to this conviction, Dyson apparently has other convictions that are specifically admissible under Rule 609 and he concedes as much in his reply. (R. 86, Reply at 3.) But without more information about his convictions, the court cannot determine *in limine* that all of the remaining felony convictions are inadmissible. Additionally, as discussed above, what Dyson says at trial about his emotional damages may impact the admissibility or relevance of his other convictions. Therefore, Dyson's motion No. 5 with respect to other prior convictions is denied.

### (c) Parole Status

Dyson wishes to prevent Szarzynski from pointing out at trial that he was on parole at the time of his arrest.  (R. 51, Pl.'s Mot. at 3-4.)  He argues that the prejudice to him substantially outweighs any probative value of the fact that he was on parole.  Szarzynski asserts that he expects Dyson to argue that "he would not violate the law, since he had just been released from prison and was fearful of returning to jail."  (R. 64 at 5.)  Although evidence about Dyson's parole status would normally be inadmissible, Szarzynski is correct that Dyson may open the door to this subject depending on what he says at trial.  *See, e.g., Bruce v. City of Chicago,* No. 09 CV 4837, 2011 WL 3471074, at *3 (N.D. Ill. Jul. 29, 2011); *McClain v. Anchor Packing Co.*, No. 89 CV 6226, 1996 WL 417540, at *4 (N.D. Ill. July 23, 1996) ("Rulings on motions *in limine* are not etched in stone; eliciting certain testimony on direct examination may open the door for presentation of previously excluded evidence.") (Citation omitted).  Because Dyson has not opened the door to evidence of his parole, motion No. 5 is granted as to his parole status.  Szarzynski may raise this issue again after Dyson's direct examination.

### 6.    Motion No. 6 to Exclude Non-Party Witnesses From the Courtroom

Dyson seeks to bar non-party witnesses from the courtroom during trial.  (R. 52.)  The exclusion of non-party witnesses from the courtroom is commonplace and good trial practice.  *See, e.g., Perry v. Leeke*, 488 U.S. 272, 281 n.4 (1989); *Christmas v. City of Chicago*, 691 F. Supp. 2d 811, 820 (N.D. Ill. 2010).  Szarzynski does not oppose the motion, and so Dyson's motion No. 6 is granted.

### 7. Motion Nos. 7 and 8 to Bar Reference to Szarzynski and Any Other Officer's Awards or Commendations and Dyson's Alleged Gang Affiliation

Dyson seeks to bar any reference to Szarzynski's awards and commendations and Dyson's alleged gang affiliation. (R. 53; R. 54.) Szarzynski does not oppose these motions. Accordingly, Dyson's motion Nos. 7 and 8 are granted.

## B. Szarzynski's Motions *in Limine*

### 1. Motion No. 1 to Exclude the Testimony of Aeisha McCullom

Szarzynski moves to exclude a third-party witness Aeisha McCullom from testifying on the ground that Dyson failed to provide adequate contact information for her. (R. 55.) Szarzynski is understandably frustrated having attempted twice to subpoena McCullom for her deposition based on incorrect contact information provided by Dyson. One of the addresses Dyson provided turned out to be a shopping mall. (Id. at 2.) Furthermore, it is not clear what efforts Dyson has made to provide good information regarding her whereabouts since the most recent address for McCullom turned out to be no longer valid. Nevertheless, McCullom is not a party to this lawsuit. And while the fact that Dyson and McCullom are cousins is eyebrow-raising, this familial relationship itself does not raise any inference of bad faith.

Although Szarzynski did not actively pursue discovery sanctions under Rule 37, he is not foreclosed from seeking relief under this section now. Fed. R. Civ. P. 37(c) advisory committee's note (1993) ("The revision provides a self-executing sanction for failure to make a disclosure required by Rule 26(a), without need for a

motion under subdivision (a)(2)(A)").  The court has already warned Dyson of this sanction on a prior occasion.  (R. 39.)  Therefore, based upon the court's inherent authority to manage trials, it is ordered that Dyson provide an accurate address for service upon McCullom by January 9, 2015.  If an address is not provided, or if McCullom cannot be served at the new address despite good faith efforts, she will be precluded from testifying at trial.  Szarzynski is granted leave to depose McCullom by February 9, 2015.  Szarzynski's motion No. 1 is denied without prejudice.

## 2. Motion No. 2 to Bar Testimony, Evidence, or Argument Suggesting that Szarzynski Will Be Indemnified by  the City for Any Compensatory Damages

Szarzynski seeks to prevent Dyson from introducing any evidence or argument that the City would indemnify Szarzynski for any compensatory damages awarded in this case.  (R. 57.)  According to Szarzynski, alerting the jury to the City's obligation to indemnify him "is akin to refer[ring] to insurance which is precluded by Fed. R. Evid. 411." (Id. at 2.)  Rule 411 states that:

> Evidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently or otherwise wrongfully.  But the court may admit this evidence for another purpose, such as proving a witness's bias or prejudice or proving agency, ownership, or control.

Although Rule 411 does not expressly prohibit the admission of indemnification evidence in cases such as this one, some courts in this circuit have found that such evidence runs afoul of this rule.  *See, e.g., Figueroa v. City of Chicago*, No. 97 CV 8861, 2000 WL 520926, at *1 (N.D. Ill. Apr. 24, 2000).  Even if evidence of indemnification does not offend Rule 411, such evidence may still be more

prejudicial than probative.  *See Townsend v. Benya*, 287 F. Supp. 2d 868, 874 (N.D. Ill. 2003) (excluding indemnification evidence of the City of Chicago based upon a Rule 403 balancing test).

The court agrees that the City's indemnification obligation should not be discussed at trial.  The scant probative value of the City's indemnification obligation is greatly outweighed by its unfair prejudice to Szarzynski.  However, if Szarzynski pleads poverty at trial in an attempt to reduce any prospective compensatory or punitive damages award against him, the balance may weigh in favor of allowing Dyson to point out the City's indemnification obligation.  Accordingly, Szarzynski's motion No. 2 is granted.  However, Dyson may raise this issue again after Szarzynski's direct examination.

Dyson is also barred from referring to Szarzynski's attorneys as "Assistant City Attorneys" or "the City lawyers" or "employees of the City."  Characterizations of his lawyers have no relevance to this lawsuit and may only be prejudicial to Szarzynski.  *See Walker v. Saenz*, No. 91 CV 3669, 1992 WL 317188, at *3 (N. D. Ill. Oct. 27, 1992).

### 3.  Motion No. 3 to Bar Reference to Violation of Police Department Rules, Policies, Regulations, or General Orders

Szarzynski seeks to prevent Dyson from raising issues related to the possible violation of police department rules, policies, regulations, or general orders.  In support of the motion, Szarzynski argues that such evidence is prejudicial but not relevant, citing numerous cases, including *Thompson v. City of Chicago*, 472 F.3d 444 (7th Cir. 2006), and *Ratliffe v. City of Chicago*, No. 10 CV 739, 2012 WL

5845551 (N.D. Ill. Nov. 19, 2012).  According to *Thompson*, "the violation of police regulations or even a state law is completely immaterial as to the question of whether a violation of the federal constitution has been established."  472 F.3d at 454.

In response, Dyson argues that potential violations of rules or general orders "are at least probative towards the 'reasonable officer' standard and are part of the circumstances that the reasonable officer brings to a given situation."  (R. 69, Resp. at 1-2.)  Dyson also points out that if Szarzynski testifies that his assessment of a situation is rooted in his "experience and training," that he should be permitted to ask about any deviation from applicable rules and general orders.  (Id. at 2.)  But Dyson is not speaking directly to the motion, which is designed to prevent him from attempting to connect possible rule and general order violations with constitutional violations.  Accordingly, Szarzynski's motion No. 3 is granted.

### 4.    Motion No. 4 to Bar Testimony, Argument, or Innuendo of Racial Motivation

Szarzynski seeks to prevent Dyson from invoking a racial motivation for his arrest.  Dyson concedes in his response that "there is currently no evidence that Defendant's conduct was racially motivated."  (R. 70, Pl.'s Resp. at 1.)  If Szarzynski was racially biased against Dyson, that is relevant to a claim for false arrest.  At the same time, however, "[a]ppeals to racial passion can distort the search for truth and drastically affect a juror's impartiality."  *United States v. Doe*, 903 F.2d 16, 25 (D.C. Cir. 1990).  Because Dyson concedes that he is without any evidence of racial bias, Szarzynski's motion No. 4 is granted.

### 5. Motion No. 5 to Bar Any Implication That Chicago Police Personnel Are Being Paid to Testify

Citing Rules 401 and 402, Szarzynski seeks to bar "implication or testimony that Chicago Police Department Personnel are being paid by the City of Chicago." (R. 60.) Dyson argues that "it is an objective fact that the City of Chicago is compensating Chicago Police Department Personnel to appear in Court and testify." (R. 71, Resp. at 1.) And indeed, Dyson is correct that the motion is too broad. The court should not bar "implication" in situations where it will be apparent to the jury that Chicago police offers are paid by the City, and that they may appear in court in the course of their employment. Szarzynski's motion No. 5 is denied in these respects. But the motion is granted insofar as it seeks to bar Dyson from arguing or insinuating at trial that the officers are providing testimony in exchange for payment from the City.

### 6. Motion No. 6 to Bar Testimony, Evidence, or Argument That Fingerprint Testing Was Not Completed or that Such Testing Should Have Been Completed on the Recovered Weapon

Szarzynski seeks to bar evidence pertaining to the subsequent investigation on the recovered weapon on the grounds that such evidence is both irrelevant and unfairly prejudicial, and such evidence may cause jury confusion. (R. 61.) In response, Dyson does not argue that Szarzynski had any authority or discretionary power whatsoever to control the subsequent investigation of the weapon, to say nothing of his responsibility to do so. (R. 72, Resp. at 1-2.) Nor does Dyson advance any argument about Szarzynski's ability to conduct or demand the administration of fingerprint analysis on the recovered weapon. (Id.) As Szarzynski argues in his

reply, "[t]he validity of an arrest depends on what is known at the moment of the arrest, not on evidence that may be developed years later." *Phillips v. Allen*, 668 F.3d 912, 915 (7th Cir. 2012). As such, the probative value of evidence about fingerprint testing in this case is close to zero. On the other hand, the potential prejudice to Szarzynski and risk of jury confusion is relatively high. For these reasons, Szarzynski's motion No. 6 is granted.

## C.    Agreed Motions *in Limine*

The following agreed motions *in limine* are granted: (1) motion No. 1 to bar testimony, evidence, or argument regarding prior disciplinary action, complaint registers, lawsuits, or other pending or past complaints against Szarzynski or any other testifying police personnel; (2) motion No. 2 to bar evidence of any internal or Independent Police Review Authority investigation and the nature and quality of said investigation; (3) motion No. 3 to bar testimony, evidence, or argument regarding a "code of silence" or "blue wall" or that Chicago Police Officers generally protect other officers, cover up for other officers, or fail to intervene in the misconduct of other officers; (4) motion No. 4 to bar any testimony, evidence, or argument of controversial unconstitutional, illegal, or questionable conduct by officers who are not a party to this case; (5) motion No. 5, to bar any argument that the jury should send the City a message with its verdict, or that the jury should punish the City with its verdict; (6) motion No. 6, to bar any evidence or suggestion that the City improperly trains, disciplines, or investigates misconduct of officers or has improper policies or procedures; (7) motion No. 7, to bar any evidence or

argument regarding settlement; (8) motion No. 8, to bar testimony, evidence, or argument that police officers were involved in a conspiracy or that police officers conspired to violate Dyson's civil rights; and motion No. 9, to bar any testimony, evidence, or argument regarding alleged police harassment or prior incidents with non-party officers by any witness or Dyson.

## Conclusion

For the foregoing reasons, Dyson's motion Nos. 1, 3, 4, and 6-8 are granted, Dyson's motion No. 2 is denied as moot, Dyson's motion No. 5 is granted in part and denied in part, Szarzynski's motion No. 1 is denied without prejudice, Szarzynski's motion Nos. 2-4, and 6 are granted, Szarzynski's motion No. 5 is granted in part and denied in part, and agreed motion Nos. 1-9 are granted.

**ENTER:**

Young B. Kim
United States Magistrate Judge